J-S62022-15

2016 PA Super 21

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DONALD C. EICHLER | |
| Appellant | No. 439 WDA 2015 |

Appeal from the Judgment of Sentence February 9, 2015
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0004938-2012

BEFORE: GANTMAN, P.J., JENKINS, J., and PLATT, J.[*]

OPINION BY JENKINS, J.: **FILED FEBRUARY 02, 2016**

While driving his pickup truck, Donald Eichler struck and severely injured a wheelchair-bound pedestrian. Less than ninety minutes later, police officers discovered the pickup truck on Eichler's property and found Eichler in highly intoxicated condition.

A jury found Eichler guilty of aggravated assault by vehicle while driving under the influence ("aggravated assault by vehicle while DUI"), DUI - general impairment, DUI - highest rate of alcohol, and accidents involving death or personal injury.[1] The trial court sentenced Eichler to 1½-8 years' imprisonment for aggravated assault by vehicle while DUI and a concurrent term of 1-2 years' imprisonment for accidents involving death or personal

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 75 Pa.C.S. §§ 3735.1(a), 3802(a)(1) & (c), and 3742(a), respectively.

injury. Eichler's sentence for DUI – highest rate of alcohol merged for purposes of sentencing with his sentence for aggravated assault by vehicle while DUI. Eichler filed a timely notice of appeal, and both Eichler and the trial court complied with Pa.R.A.P. 1925. We affirm.

Eichler raises four issues on appeal, which we have re-ordered for dispositional purposes:

1. Whether the court erred when denying [Eichler's] omnibus pretrial motion challenging the constitutionality of the Commonwealth's warrantless search of [Eichler's] property?

2. Whether the court erred when denying [Eichler's] omnibus pretrial motion challenging the admissibility of [his] blood alcohol test taken more than two hours after driving?

3. Whether the Commonwealth failed to present sufficient evidence to allow the jury to convict [Eichler] of aggravated assault by DUI?

4. Whether the Commonwealth failed to present sufficient evidence to establish that [Eichler] was, at the time of driving, intoxicated, driving under the influence as prohibited by law and/or was intoxicated to such a degree that he was incapable of safe driving?

Brief For Appellant, at vii.

I.

Eichler's first two arguments on appeal challenge the trial court's denial of his motion to suppress. Our standard of review of a trial court's suppression ruling requires us to determine

whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the

evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Cruz*, 71 A.3d 998, 1002-03 (Pa.Super.2013).

Our scope of review includes both the suppression record and the trial record, a point which requires fairly extensive discussion. We recognize that our Supreme Court held in *In Re L.J.*, 79 A.3d 1073 (Pa.2013), that appellate review is limited to the suppression record in the absence of exceptional circumstances. *L.J.*, however, does not apply to the present case, because litigation in this case commenced before the Supreme Court issued its decision in *L.J.* Pre-*L.J.* decisions authorize us to include the trial record in our review.

The bellwether of pre-*L.J.* jurisprudence is *Commonwealth v. Chacko*, 459 A.2d 311 (Pa.1983), in which our Supreme Court stated that when an appellate court reviews an appeal from an order denying a motion to suppress, "it is appropriate to consider *all* of the testimony, not just the testimony presented at the suppression hearing, in determining whether evidence was properly admitted." *Id*. at 317 n.5 (emphasis in original). Between 1983 and 2013, the Superior Court construed *Chacko's* footnote as binding precedent. *See, e.g., Commonwealth v. Charleston,* 16 A.3d 505, 516–17 (Pa.Super.2011) (quoting *Chacko*).

- 3 -

In *L.J.*, however, a majority of the Supreme Court (Justice Baer, joined by Chief Justice Castille and Justices Saylor and Todd) held that *Chacko's* footnote was mere dicta. Justice Baer's opinion further held that "the suppression court's denial of suppression is final and binding at the conclusion of the suppression hearing." *Id.* at 1084. During trial, the defendant may not seek reconsideration of the suppression order unless he submits evidence that was "previously unavailable." *Id*. at 1084-85. Moreover, an appellate court must limit its review to the suppression record. *Id*. at 1087.

Justices McCaffrey and Stevens dissented, arguing that the proper scope of review includes both the suppression and trial record. *L.J.*, at 1091-93. Justice Eakin authored a concurring and dissenting opinion asserting that review should be limited to suppression record but that the exception to this general rule should have different parameters than the "previously unavailable" exception. *Id*. at 1089-91.

Most importantly for purposes of the present case, Justice Baer wrote in Section IV of his opinion that the decision in *L.J.* only applied prospectively "to litigation commenced Commonwealth-wide after the filing of this decision." *Id*., 79 A.3d at 1089. Section IV, however, did not garner a majority of the Court. Only two justices (Chief Justice Castille and Justice Todd) joined this section. *Id*. Justice Saylor concurred with the result with respect to Section IV. *Id*. Justice Eakin was silent on Section IV in his

concurring and dissenting opinion. *Id*. at 1089-91. And, as noted above, Justices McCaffery and Stevens dissented *in toto*. *Id*. at 1091-93. Thus, Section IV is not binding. *See Commonwealth v. Bomar*, 826 A.2d 831, 843 n.13 (Pa.2003) (plurality opinion of Supreme Court is not binding).

Because the decision in *L.J.* failed to resolve the prospectiveness issue, it is our task to do so. *See Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 101 (Pa.Super.2009) ("when dealing with an issue not previously resolved by our Supreme Court, it is this Court's job to predict how our Supreme Court would reason and resolve the issue").

We find Justice Baer's analysis of prospectiveness in *L.J.* highly persuasive. And while Justice Saylor and Justice Eakin did not join Justice Baer's analysis on this point, they did not criticize his approach or offer any alternative solution. For these reasons, we adopt the analysis in Section IV of Justice Baer's opinion as our own and reprint the heart of it below:

> Despite our rejection of the *Chacko* footnote ... as binding precedent, we cannot ignore that *Chacko* was a pronouncement of this Court upon which the Superior Court, trial courts, and parties have relied upon for almost thirty years. ...
>
> 'When this Court issues a ruling that overrules prior law, expresses a fundamental break from precedent, upon which litigants may have relied, or decides an issue of first impression not clearly foreshadowed by precedent, this Court announces a new rule of law.' *Fiore v. White*, [] 757 A.2d 842, 847 ([Pa.]2000). One of the hallmarks of whether this Court has issued a new rule of law is if the decision overrules, modifies, or limits any previous opinions of this Court. *Kendrick v. Dist. Attorney of Phila. County*, [] 916 A.2d 529, 538 ([Pa.]2007).

'While retroactive application of a new rule of law is a matter of judicial discretion usually exercised on a case-by-case basis, the general rule is that the decision announcing a new rule of law is applied retroactively so that a party whose case is pending on direct appeal is entitled to the benefit of the changes in the law.' **Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.,** [] 20 A.3d 468, 479 ([Pa.]2011).

In considering whether to deviate from this general rule, we consider: (1) the purpose of the new rule; (2) the extent of reliance by courts and litigants upon the old rule, and (3) the effect the new rule of law will have on the fair administration of justice. **Kendrick**, 916 A.2d at 536. In furtherance of this first prong, we may also consider whether the issue involved concerns substantive or procedural law. **Freed v. Geisinger Med. Ctr.,** [] 971 A.2d 1202, 1213 ([Pa.]2009). We possess greater discretion to impose a decision prospectively only 'if the [new rule of law] is of the court's own making, involves a procedural matter, and involves common law development.' **Id.** (quoting **Kendrick**, 916 A.2d at 539).

Under the guidelines of both **Fiore** and **Kendrick**, we initially hold that today's decision does announce a new rule of law, such that an examination of retroactive or prospective application is necessary. First, litigants and courts have clearly relied upon the **Chacko** footnote, as reflected in the cases such as **Charleston**, cited above. Second, while this decision is not a 'fundamental break from precedent' in that the **Chacko** footnote was never precedential in the first instance, this opinion certainly 'modifies or limits' that footnote and the applicability of ... **Chacko** ... in Pennsylvania. Accordingly, this opinion constitutes a new rule of law.

We thus turn to examining whether this decision should be afforded the general rule of retroactive application. First, the rule today is generally procedural, as it merely reinforces the procedure required for the review of the denial of a suppression motion and the re-opening of the suppression hearing to consider previously unavailable evidence. Moreover, it merely instructs reviewing courts moving forward that they are no longer to apply the procedure and scope of review seemingly authorized by the **Chacko** footnote. Second, and as has been repeatedly stated *supra,* the reliance upon the **Chacko** footnote has been extensive. Finally, given that this opinion serves to

right an inaccurate interpretation of prior law, we find that this decision significantly alters the appellate process of this and other cases substantially ...

Given all of this, the best course in this case, to ensure the fair administration of justice for all parties and to cases already commenced where the litigants have potentially relied upon the **Chacko** footnote is to give this decision prospective effect ... [A]ll litigation commenced Commonwealth-wide after the filing of this decision ... will be considered in accord with this opinion.

**L.J.**, 79 A.3d at 1087-89.

The present case began on November 16, 2012, the date of Eichler's arrest. In addition, the suppression hearing took place on August 22, 2013, two months before the Supreme Court issued its decision in **L.J.** Since **L.J.** only applies prospectively, we decline to apply it to this case. Instead, our scope of review includes both the suppression record and trial record, the test articulated in **Chacko's** footnote and deemed binding by this Court in pre-**L.J.** jurisprudence. **See** nn. 4 & 9, **infra** (instances in which our review of suppression issues incorporates trial testimony).

II.

In his first argument, Eichler contends that the trial court erred by denying his motion to suppress evidence obtained during a warrantless search outside of his residence.

The following evidence is pertinent. Shortly before 6:00 p.m. on November 6, 2012, Danielle Hitson was driving her car on Collinsburg Road

when she observed a black pickup truck ahead of her driving erratically. Preliminary Hearing Transcript ("PH"), at 7-11.[2] There appeared to be only one person in the truck. *Id*. at 10. The truck turned right onto Route 136, and Hitson followed. *Id*. at 7. She observed the truck swerving continuously and erratically on and off the roadway, crossing the center of the road, nearly striking guardrails and embankments, and nearly running a stop sign. *Id*. at 7-10. Near the Gun Rack business establishment, the truck struck what Hitson thought was a mailbox to the right of the roadway, causing debris to fly past her vehicle. *Id*. at 11-14. The truck sped up, turned off its lights and turned left onto Salem Church Road. *Id*. at 14, 25.

At 5:57 p.m., Sergeant Anthony Gillingham of the West Newton Police Department, while in a marked patrol vehicle and in full uniform, received a request to assist the Rostraver Police Department in responding to a motor vehicle accident near the Gun Rack. SH, at 6-7. At the accident scene, Sergeant Gillingham observed the victim, Byron White, lying motionless in a grass field next to the roadway berm. *Id*. at 8. A motorized wheelchair lay on its side next to White. *Id*. White uses a wheelchair because he is handicapped. PH, at 29.

Black debris littered the ground near White, and one piece of debris, a fender well, bore a Nissan logo. SH, at 9. From the color of the debris,

---

[2] The court admitted the preliminary hearing transcript into evidence during the suppression hearing. Suppression Hearing Transcript ("SH"), at 5.

Sergeant Gillingham realized that the vehicle involved in the accident was black. *Id*. at 29. Another officer at the scene called a Nissan dealership and recited the serial number on the fender well. *Id*. at 10. The dealership advised that the police should look for a Nissan Titan pickup truck. *Id*. Sergeant Sokol of the Rostraver Police Department asked Sergeant Gillingham to search the surrounding area for a vehicle fitting this description. *Id*.

Sergeant Gillingham drove up Salem Church Road and met a Game Commission Officer who lived in the area. SH, at 10-11. The Game Commission Officer stated that there was a black Nissan Titan truck at a residence on Salem Church Road and described the general location of the residence. *Id*. at 11-12. Sergeant Gillingham realized that the Game Commission Officer was describing the residence belonging to Eichler, whom Sergeant Gillingham had known all his life. *Id*. at 12. It also occurred to Sergeant Gillingham that Eichler drove a black Nissan Titan pickup truck. *Id*. Sergeant Gillingham decided to drive to Eichler's residence to investigate whether Eichler was involved in the accident. *Id*. at 28 (prosecutor asked whether Sergeant Gillingham "[was] going to Mr. Eichler's to either confirm that he was involved or to rule him out so you could continue your search," and Sergeant Gillingham responded "that's correct").

Sergeant Gillingham proceeded to Eichler's residence at 274 Salem Church Road, 2.3 miles from the accident scene. SH, at 12-13, 51. There

were no antifreeze droppings or debris trail leading to Eichler's house. *Id*. at 19.

Eichler's house stands about 200 feet from Salem Church Road, on a hillside at least 40 feet above the road, at the end of a long, steep driveway which bends to the left through dense trees and shrubbery. SH at 12-13, 20, 34-35, 42; Defense exhibit D. There are no fences, gates or "no trespassing" signs to keep visitors out. SH, at 13.

At 7:16 p.m., Sergeant Gillingham arrived at Eichler's house. SH, at 17. It was dark, so his patrol vehicle's headlights were on. *Id*. at 14. When Sergeant Gillingham drove up the driveway and rounded a bend, he observed the back of a black Nissan Titan truck on the driveway next to the right side of a one-story house. *Id*. at 12-15, 20-21. The truck was parked inward and had not been visible from Salem Church Road. *Id*. at 14-15; Defendant's Exhibits B, C.

As Sergeant Gillingham drove up the driveway, Eichler was standing outside of the house with his dog. SH, at 15. Eichler and his dog went inside the house as the patrol vehicle approached. *Id*. While Eichler was inside, Sergeant Gillingham pulled up directly behind the truck, exited his patrol vehicle, walked to the front of the pickup truck, and examined the truck with his flashlight. *Id*. at 15, 22; Defendant's Exhibits B, C. He observed a large amount of damage to the right front corner and passenger side of the truck. *Id*. at 16.

At that point, Eichler emerged from his house "staggering [with] a strong odor of alcohol [and] visibly highly intoxicated." SH, at 16; *see also id.* at 45, 51 (following arrest, Eichler smelled strongly of alcohol, had bloodshot eyes and "could barely walk"). Sergeant Gillingham asked: "Donny, why did you leave the scene of the accident?" *Id*. Eichler answered: "Because I've been drinking."[3] *Id*. at 17. Sergeant Gillingham handcuffed Eichler, placed him in the back of the patrol vehicle, and contacted Sergeant Sokol, who arrived at Eichler's house shortly thereafter. *Id*. at 17, 33.

Sergeant Sokol observed "fresh damage" to the front end of the pickup truck and discovered that the engine block was still warm. SH, at 34. He told Eichler that he was under arrest for DUI and gave him *Miranda* warnings. *Id*. at 36. Eichler waived his rights and stated that he had been drinking beer at a bar in Collinsburg and thought he struck a deer on his way home. *Id*.

Sergeant Sokol instructed Rostraver Police Officer Sholtis to transport Eichler to the hospital for a blood test. SH, at 37. Eichler did not consume

_____

[3] Although Eichler did not receive warnings required under *Miranda v. Arizona*, 384 U.S. 436 (1966), before answering Sergeant Gillingham's question, he did not move to suppress his answer under the Fifth Amendment. Nevertheless, suppression of this answer would not have changed the outcome of this case, because (1) there was probable cause to arrest him before he gave his answer, and (2) following his arrest, he admitted drinking in multiple *Mirandized* statements.

any alcoholic beverages between the time of his arrest and the time of his blood draw. Trial Transcript ("Tr."),[4] at 137 (Sergeant Gillingham's testimony that Eichler did not consume any alcohol following his arrest), 166 (Sergeant Sokol's testimony that Eichler did not consume any alcohol in the sergeant's presence at scene of arrest), 197 (Officer Sholtis' testimony that Eichler did not consume alcohol between time Sergeant Sokol directed officer to take Eichler to hospital and time of blood draw). Officer Sholtis drove Eichler to Mon Valley Hospital, where Eichler agreed to a blood test. Tr., at 46. At 8:12 p.m., Officer Sholtis witnessed the blood draw. *Id*.

Following the suppression hearing, the trial court entered an opinion and order denying Eichler's motion to suppress the evidence obtained during the warrantless search of his property. The findings of fact in the court's opinion are consistent with the evidence summarized above. Opinion, December 16, 2014, at 1-2.

Eichler contends that Sergeant Gillingham violated his Fourth Amendment rights by entering the curtilage surrounding Eichler's house, where Eichler enjoyed a reasonable expectation of privacy, and searching

_____

[4] Had *L.J.* applied, we could not have taken this trial evidence into account in our review of this suppression issue. But because *L.J.* does not apply retroactively to this case, and because our pre-*L.J.* decisions follow *Chacko*, we may include trial evidence in our review. *See Charleston*, 16 A.3d at 516–17.

the outside of Eichler's truck without a warrant.[5]  The Fourth Amendment

provides in relevant part that the "right of the people to be secure in their

_____

[5] While Eichler challenges Sergeant Gillingham's actions under expectation-of-privacy principles, he does not challenge Sergeant Gillingham's conduct under "property-based" standards, a separate Fourth Amendment doctrine that the United States Supreme Court has applied recently in ***United States v. Jones***, -- U.S. --, 132 S.Ct. 945 (2012), and ***Florida v. Jardines***, -- U.S. --, 133 S.Ct. 1409 (2013).  "Property-based" analysis is "tied to common-law trespass."  ***Jones***, 132 S.Ct. at 949.  The home "is first among equals" in this analysis, for "at the [Fourth] Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  ***Jardines***, 133 S.Ct. at 1414 (citations omitted).  The curtilage, the area "immediately surrounding and associated with the home," is "part of the home itself for Fourth Amendment purposes."  ***Id***.  When an officer enters the curtilage, the key inquiry under the property-based test becomes whether an "implied license" exists for the officer's conduct within the curtilage.  ***Id***. at 1415.  For example, an implied license exists for the officer to approach the house by the front path without a warrant and knock on the front door for the purpose of asking the occupant about an ongoing investigation.  ***Id***.  Such conduct is permissible because it is "no more than any private citizen might do."  ***Id***.  Conversely, an officer does not have an implied license to "explor[e] the front path with a metal detector, or march[] his bloodhound into the garden before saying hello and asking permission."  ***Id***.

***Jones*** and ***Jardines*** indicate that defendants have the option to raise Fourth Amendment challenges under both expectation-of-privacy and property-based principles.  ***See, e.g., Jones***, 133 S.Ct. at 1417 ("the … reasonable-expectation-of-privacy test has been *added to,* not *substituted for,* the common-law trespassory test"; because officer's conduct violated property-based test, "we need not decide whether the … investigation of Jardines' home violated his expectation of privacy") (emphasis in original).  Here, however, Eichler restricted his Fourth Amendment challenge to expectation-of-privacy principles, so we find it inappropriate to analyze Eichler's argument under property-based principles.  "It would be improper for this Court to act as counsel for a party... [W]e must not write a party's brief and develop the analysis necessary to support the party's position."  ***Commonwealth v. Frey,*** 41 A.3d 605, 613–614 (Pa.Super.2012); ***see also Commonwealth v. Little***, 903 A.2d 1269, 1272-73 (Pa.Super.2006) *(Footnote Continued Next Page)*

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "The law of search and seizure remains focused on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime." *Commonwealth v. Bostick*, 958 A.2d 543, 556 (Pa.Super.2008).

In general, warrantless searches and seizures in a private home violate both the Fourth Amendment and Article 1, [Section] 8 of the Pennsylvania Constitution." *Commonwealth v. Gibbs*, 981 A.2d 274, 279 (Pa.Super.2009). Our courts have extended this constitutional protection to the curtilage of a person's home by analyzing "factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id.* at 279. "Curtilage is entitled to constitutional protection from unreasonable searches and seizures as a place where the occupants have a reasonable expectation of privacy that society is prepared to accept." *Commonwealth v. Fickes*, 969 A.2d 1251, 1256 (Pa.Super.2009).

*(Footnote Continued)* ────────────────────

("[A]ppellate review of an order denying suppression is limited to examination of the precise basis under which suppression initially was sought; no new theories of relief may be considered on appeal").

We hold that Sergeant Gillingham did not violate Eichler's Fourth Amendment rights. Although Sergeant Gillingham entered Eichler's curtilage to inspect the truck, he had the authority to enter private property for purposes of a police investigation, and he restricted his movements to areas where visitors could be expected to go.

As stated above, the United States Supreme Court has defined the curtilage as the area "immediately surrounding and associated with the home" and has stated that the curtilage is "part of the home itself for Fourth Amendment purposes." *Jardines*, 133 S.Ct. at 1414. Since Eichler parked his truck several feet from his house, it clearly was within the curtilage at the time of Sergeant Gillingham's inspection.[6]

_____

[6] We note that this Court has held that driveways to private residences are not curtilage. *See Commonwealth v. Simmen*, 58 A.3d 811, 815 (Pa.Super.2012) (holding, where defendant's car was parked in driveway, that driveway "was not curtilage," so officer viewed defendant's vehicle from lawful vantage point by walking up driveway); *Commonwealth v. Loughnane*, -- A.3d --, 2015 WL 7432463, *7 (Pa.Super., 11/23/15) (citing *Simmen*) (federal automobile exception recently adopted by Pennsylvania Supreme Court "applies to vehicles parked in driveways at private residences, because driveways are not part of a home's curtilage, and an individual does not have a reasonable expectation of privacy over the driveway").

We find it necessary to follow *Jardines*, because this Court must follow the United States Supreme Court's interpretation of the federal Constitution. *See Commonwealth v. Jemison*, 98 A.3d 1254, 1257 (Pa.2014). Under *Jardines*, Eichler's truck was within the curtilage, even though it also happened to be parked in his driveway. It also is possible to harmonize *Simmen* and *Loughnane* with *Jardines*. In *Simmen*, the car was parked 20-30 feet away from the defendant's residence, *id*., 58 A.3d at 813, so it

*(Footnote Continued Next Page)*

This, however, does not end our inquiry, for two other principles require consideration. First, police officers have the authority to enter the curtilage for the purpose of conducting an investigation. ***Commonwealth v. Gibson***, 638 A.2d 203, 207 (Pa.1994) ("police have the power to knock on the doors of the citizens of this Commonwealth *for investigatory purposes* without probable cause") (emphasis added). Second, entry onto the curtilage generally is not a Fourth Amendment violation when the curtilage is used by the public. ***Cf. Gibbs***, 981 A.2d at 280 ("courts which have found that the front porch constitutes curtilage have generally found no Fourth Amendment violation where the porch in question is used by the general public"); ***see generally*** LaFave, *Search And Seizure: A Treatise On The Fourth Amendment*, § 2.3(f) (5th ed.) (database updated October 2015) ("when the police come on to private property to conduct an investigation ... and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment").[7]

*(Footnote Continued)* ────────────────

arguably fell outside the zone that ***Jardines*** designates as curtilage (area immediately surrounding the home). ***Loughnane*** did not specify where the vehicle was parked on the driveway, so it, too, might have fallen outside ***Jardines'*** definition of curtilage.

[7] Professor LaFave gathers 49 cases in support of this precept, including ***Trimble v. State***, 842 N.E.2d 798, 802 (Ind.2006) (police entry onto private property and their observations do not violate Fourth Amendment when police have legitimate investigatory purpose for being on property and
*(Footnote Continued Next Page)*

Applying these principles, we conclude that Sergeant Gillingham's conduct was constitutional. Sergeant Gillingham was investigating a serious hit-and-run accident that had occurred just over one hour before. He obtained information at the accident scene and then from a Game Commission Officer that gave him reason to believe that a black Nissan pickup truck owned by Eichler was involved in the accident. While Eichler's house stands 200 feet from the roadway, it is still accessible to the general public, because there are no fences or gates on his driveway or signs that warn against trespassers or prohibit public entry. *Gibbs*, 981 A.2d at 280 (officers conducting surveillance of suspected drug dealer's residence did not need warrant to enter front porch, where porch was empty, unenclosed concrete slab that did not have gate blocking entry, there were no signs warning against trespass or evidence that defendant prohibited general public from accessing porch, and officers observed pizza deliveryman and suspected drug purchasers use porch shortly before officers decided to approach front door). As Sergeant Gillingham drove up the driveway, he

_(Footnote Continued)_ ───────────────

limit their entry to places visitors would be expected to go; the route which any visitor to residence would use is not private in Fourth Amendment sense, so if police take that route for purpose of making general inquiry or for some other legitimate reason, they are free to keep their eyes open), and *State v. Lodermeier*, 481 N.W.2d 614, 624 (S.D.1992) (approving officer's examination of exterior of garden tractor parked in driveway, because "even though it is part of the curtilage, an officer with legitimate business may enter a driveway and, while there, may inspect objects in open view"). *See* LaFave, § 2.3(f) at n. 225 and 229.

saw a black Nissan pickup truck next to the house, so he parked directly behind the truck, exited his patrol vehicle, walked several feet to the front of the truck, and observed significant damage. These were all reasonable acts within the course of a legitimate police investigation. *Gibson*, 638 A.2d at 207. The truck was in plain view, and the front of the truck was in a location where visitors could be expected to go. *Gibbs*, 981 A.2d at 280; *see also Trimble*, 842 N.E.2d at 802; *Lodermeier*, 481 N.W.2d at 624.[8]

Having established that Sergeant Gillingham's inspection of Eichler's pickup truck was constitutional, we conclude that the results of this search, combined with Eichler's visibly intoxicated condition and his admission that he left the scene of an accident because he was drinking, gave Sergeant Gillingham probable cause to arrest Eichler for DUI, aggravated assault by vehicle while DUI, and accidents involving death or personal injury. *See*

_____

[8] We note that in *Commonwealth v. Bowmaster*, 101 A.3d 789 (Pa.Super. 2014), this Court held that the trial court erred by refusing to suppress evidence seized during the warrantless search of a residence, where police officers investigating a report of a stolen handgun reached the front door by entering a yard that was surrounded by a chain-link fence and closed gate with "Private Property" and "Beware of Dog" signs posted on the fence. Unlike *Bowmaster*, there is no evidence in the present case that Eichler's property was off limits to the general public. Moreover, the majority opinion in *Bowmaster* did not address *Gibson's* principle that police officers may enter the curtilage in the course of a legitimate investigation to knock on the door and question the occupant. Judge Olson aptly observed in her concurring opinion that mere entrance on the curtilage was permissible under *Gibson*, because it was what "any member of the public might do." *Bowmaster*, 101 A.3d at 797.

- 18 -

***Commonwealth v. Peters***, 915 A.2d 1213, 1219-20 (Pa.Super.2007) (police officer had probable cause to arrest defendant on suspicion of DUI; officer was investigating report that truck struck utility pole, officer determined that defendant's truck was involved in the accident and went to his house, defendant admitted to officer that he drank five beers before the accident, officer observed that defendant had bloodshot, glassy eyes, defendant emitted strong odor of alcohol, and defendant twice changed his version of the events that led to accident and then stated that he swerved to avoid dog chasing bunny). Therefore, the trial court properly denied Eichler's motion to suppress the evidence obtained during the warrantless search on his property on the evening of November 6, 2012.

## III.

In his second argument on appeal, Eichler contends that the trial court erred by denying Eichler's motion to suppress his blood alcohol test results on the ground that it was taken more than two hours after driving. We disagree.

Section 3735.1 of the Vehicle Code provides:

> Any person who negligently causes serious bodily injury to another person as the result of a violation of [75 Pa.C.S. §] 3802 (relating to driving under influence of alcohol or controlled substance) and who is convicted of violating section 3802 commits a felony of the second degree when the violation is the cause of the injury.

75 Pa.C.S. § 3735.1.

Section 3802(a)(1) of the Vehicle Code provides:

An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle.

75 Pa.C.S. § 3802(a)(1).

Section 3802(c) of the Vehicle Code provides:

An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is 0.16% or higher within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.

75 Pa.C.S. § 3802(c).   Section 3802(c)'s requirement to take the defendant's blood test within two hours after the individual has driven is subject to a "good cause" exception within section 3802(g), which provides:

Notwithstanding the provisions of subsection … (c) … where alcohol or controlled substance concentration in an individual's blood or breath is an element of the offense, evidence of such alcohol or controlled substance concentration more than two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle is sufficient to establish that element of the offense under the following circumstances: (1) where the Commonwealth shows good cause explaining why the chemical test sample could not be obtained within two hours; and (2) where the Commonwealth establishes that the individual did not imbibe any alcohol or utilize a controlled substance between the time the individual was arrested and the time the sample was obtained.

75 Pa.C.S. § 3802(g).  In a section 3802(c) prosecution, when the blood test does not take place within two hours after the defendant drives, operates or is in actual physical control of the vehicle, test results are subject to suppression unless Commonwealth proves good cause for the delay in

obtaining a blood test and the defendant did not imbibe alcohol between his arrest and his blood test. 75 Pa.C.S. § 3802(g).

Eichler's blood draw took place more than two hours after he drove, operated or was in actual physical control of his vehicle, but under section 3802(g), the blood test results still were admissible in Eichler's section 3802(c) prosecution. Eichler's flight from the accident scene, and the consequential delay in finding him, constituted good cause for the failure to obtain his blood test within two hours after he stopped driving. Opinion and Order of Court, December 16, 2013, at 1-2, 4. The Commonwealth fulfilled section 3802(g)'s no-imbibing element by presenting the testimony of three officers during trial that Eichler did not drink alcohol between the time of his arrest and the time of his blood test.[9]

It also was correct to deny suppression of the blood test results in Eichler's section 3802(a)(1) and 3735.1 prosecutions. Section 3802(a)(1) does not include "two hour" language, so evidence of blood tests taken more than two hours after driving is admissible under subsection (a)(1) without resort to section 3802(g). **Commonwealth v. Segida**, 985 A.2d 871, 879 (Pa.2009). Moreover, section 3735.1 requires proof of a "violation of section 3802," which in turn permits evidence of a section 3802(a)(1) violation without resort to section 3802(g).

_____

[9] **See** n. 4, **supra**, and accompanying text.

IV.

Eichler's third and fourth arguments, which we review together, are challenges to the sufficiency of the evidence underlying his convictions for aggravated assault by vehicle while DUI and DUI -- general impairment. Our standard of review for challenges to the sufficiency of the evidence is well-settled:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 716 (Pa.Super.2015).

The trial court thoroughly and accurately summarized the evidence adduced during trial in its April 24, 2015 opinion. We need not recite this entire summary, because the trial evidence on many subjects (the hit-and-run accident, Sergeant Gillingham's investigation and visit to Eichler's residence, and Eichler's arrest and blood test) is identical to the suppression hearing evidence discussed above. *See* Trial Court Opinion, April 24, 2015, at 2-4. We limit our recitation of the trial court's summary to the evidence that was introduced for the first time during trial:

- 22 -

[After Eichler's blood draw, Officer] Sholtis took custody of the blood sample, placed it in a NIK kit, and transported the kit and Eichler back to the police station. While in transit, Eichler, who had been ***Mirandized***, told [Officer] Sholtis that he got into an accident on his way home.

Back at Rostraver Police Station, [Officer] Sholtis put Eichler's blood sample in the secure refrigerator[,] removed Eichler from the car, removed his handcuffs, put him in an interview room and told him he was free to go. [Officer] Sholtis added that he, [Officer] Sholtis, would drive Eichler home anytime. [Officer] Sholtis then asked if he could ask Eichler a few questions, and Eichler agreed. [Officer] Sholtis read Eichler his ***Miranda*** rights and had Eichler sign a waiver form. Eichler agreed to write a statement, but it was brief, so [Officer] Sholtis then asked Eichler questions while Sholtis took notes. [Officer] Sholtis testified to the following:

> I asked where he was this evening, and he stated that he was in the Gelman Club in Collinsburg. He stated he left there and started home. I asked what he was driving. He stated that he was driving his Nissan truck. I asked if he was alone in the truck and if he was driving. Don stated that he went to the Club alone and left the club alone. He confirmed that he was the one driving. I asked what happened after he left the club. He stated that he got on State Route 136 to go home. He stated that he was directly beside The Gun Rack when he hit a deer. I asked if he saw a deer, to which he stated that he did not. He stated that he just assumed it was a deer. I asked if he stopped after he felt the impact. Don stated that he did not stop and just continued home. He stated that he pulled up into his driveway and parked the truck. He stated that after he arrived home, he got out and found that his truck was damaged. He stated that he couldn't really see how bad the damage was and just figured that he would look in the morning. I advised him that he hit a wheelchair with a person in it. Don just looked at this officer and stated, I thought it was a deer. I documented after several more minutes I again asked if he saw what he hit on the road. He again stated he didn't see anything and just felt the impact. I again told him it was a person

in a wheelchair. After several more minutes, he stated that he hoped the person was okay. I did ask him how much he had to drink tonight. He stated that he had a few beers. I asked how much is a few. He stated three or four maybe at the Gelman Club. I asked if he drank any other alcohol beverages today. He stated that he did not, only the three or four he had at the Gelman Club. This would conclude the interview.

Trooper Todd Michael Stephenson of the Pennsylvania State Police Collision Analysis and Reconstruction Unit testified as an expert in collision analysis and reconstruction. He was called to the accident scene on November 6, 2012, at 7:00 p.m. The location of the accident occurred on [a] fairly straight two lane state highway where each side of the road has a fog line or a white line and the center is separated by a double yellow line. The total width from fog line to fog line is twenty feet. As part of his investigation, Trooper Stephenson determined that there were no adverse weather or road conditions at the time of the collision, but that, due to heavy rain in past days prior, the ground was wet, but the roadway dry. Upon examination of the Nissan pickup truck, there were no indications of heavy breaking or yaw marks, no indication that the brakes on the pickup truck were inoperable, no defects in the steering system, and his examination of the vehicle did not reveal any mechanical defects pre - existing to the impact that would have caused the crash. The wheelchair was black and weighed approximately 214 pounds, was two feet wide and three feet long, and could travel approximately 5-6 miles per hour. The chair had some white stickers on it, the wheelchair had shiny metal parts and the wheels were shiny silver as well. According to the Vehicle Code, this exempt wheelchair only has to have a red reflector on the rear and on each side which has to be visible at a distance of at least 500 feet. White's wheelchair did not have any lighting or reflective items on it. Based on the tire marks and roadway evidence, there was 1.33 feet from the fog line to the right side of White's wheelchair, which means the wheelchair was 3.33 feet into the right lane of the roadway. Trooper Stephenson testified that he inspected the damage on both the Nissan truck and White's wheelchair, and in his opinion, the damage on both lined up perfectly to show the shape of the chair lining up with the shape of the damage on the actual fender of the truck. Other aspects of damage caused by the collision of the truck and

wheelchair also lined up. Based on his investigation, Trooper Stephenson believed that the wheelchair was struck just left of center in the back with only 1 to 1.1 feet of the right side of the pickup truck striking the wheelchair. Hitting the wheelchair in that manner caused it to rotate and go off to the right. As a result of the collision, White's wheelchair was propelled 52.86 feet and White was thrown from the wheelchair. At the time of the collision, Eichler's pickup truck was traveling at 49 miles per hour. Eichler braked very briefly but did not brake again for at least six seconds according to data collected from his truck's system.

Trooper Stephenson determined that Eichler's sight distance without high beams would have been 301 feet and with high beams would have been 362 feet. Normal perception reaction time (the time for a person to perceive a threat and react to it) is 1.6 seconds for an attentive sober person in daylight. Given normal perception reaction time and the stopping ability of the Nissan pickup truck, the trooper testified that at 49 miles per hour, the truck could have stopped in 206.38 feet. At nighttime, the perception reaction time is 2.5 seconds for an attentive sober person, and with the same stopping ability of the truck at 49 miles per hour, the truck could have stopped in 271.04 feet. Additionally, with the sight distance, the trooper testified that Eichler could not only have slowed down, but also could have easily steered his pickup truck around White's wheelchair.

As a result of his entire investigation, Trooper Stephenson testified that a reasonably sober attentive driver would be able to ascertain that there was a threat in his lane, regardless of what it was. In this case, it was a wheelchair, and a sober, attentive driver would have been able to, at least, slow to a reasonable speed and be able to steer out around the wheelchair, if not stop altogether. Trooper Stephenson also testified that the combined weight of the wheelchair and White was approximately 500 pounds and that, when a driver strikes an animal, the weight is substantially less. Upon striking a 500 pound object, the driver would have to know that he hit something significant.

The parties stipulated that, if called as a witness, Dr. Robert Frank, a trauma physician in the Emergency Department at UPMC Mercy Hospital, would testify that he treated White upon his arrival at the facility. Dr. Frank diagnosed White as suffering

with rib fractures with a small hemopneumothorax, pelvic fractures with extravasation, and L1 transverse process fractures of the lumbar spine, all of which are Level 1 trauma injuries. These injuries were the result of White being struck by a motor vehicle. The injuries created a substantial risk of death and resulted in the permanent impairment of bodily functions, thus constituting serious bodily injury.

Eichler's post-arrest blood sample was sent to the Pennsylvania State Police Crime Lab for analysis. The headspace gas chromatograph analysis of the blood sample resulted in the identification of ethanol alcohol in an amount greater than three hundredths of one percent or greater than a .30 by weight in whole blood.

Trial Court Opinion, April 24, 2015, at 4-7 (citations omitted; minor stylistic and organizational revisions).

Section 3735.1 requires proof of three elements: (1) a violation of section 3802, (2) criminal negligence, and (3) causation of serious bodily injury to another person as the result of the section 3802 violation. We analyze each element *seriatim*.

*Section 3802(a)(1) and (c)*. Although it is only necessary for the Commonwealth to prove a violation of section 3802(a)(1) or section 3802(c), the evidence satisfies both subsections.

"[S]ubsection 3802(a)(1) is an 'at the time of driving' offense, requiring that the Commonwealth prove the following elements: the accused was driving, operating, or in actual physical control of the movement of a vehicle during the time when he or she was rendered incapable of safely doing so due to the consumption of alcohol." *Segida*, 985 A.2d at 879.

With respect to the type, quantum, and quality of evidence required to prove a general impairment violation under Section 3802(a)(1), **Segida** continues:

> Section 3802(a)(1), like its predecessor [DUI statute], is a general provision and provides no specific restraint upon the Commonwealth in the manner in which it may prove that an accused operated a vehicle under the influence of alcohol to a degree which rendered him incapable of safe driving.... The types of evidence that the Commonwealth may proffer in a subsection 3802(a)(1) prosecution include but are not limited to, the following: the offender's actions and behavior, including manner of driving and ability to pass field sobriety tests; demeanor, including toward the investigating officer; physical appearance, particularly bloodshot eyes and other physical signs of intoxication; odor of alcohol, and slurred speech. Blood alcohol level may be added to this list, although it is not necessary and the two hour time limit [present in other subsections in section 3802] for measuring blood alcohol level does not apply. Blood alcohol level is admissible in a subsection 3801(a)(1) case only insofar as it is relevant to and probative of the accused's ability to drive safely at the time he or she was driving. The weight to be assigned these various types of evidence presents a question for the fact-finder, who may rely on his or her experience, common sense, and/or expert testimony. Regardless of the type of evidence that the Commonwealth proffers to support its case, the focus of subsection 3802(a)(1) remains on the inability of the individual to drive safely due to consumption of alcohol-not on a particular blood alcohol level.

**Id**. 985 A.2d at 879.

In this case, shortly before 6:00 p.m. on November 6, 2012, an eyewitness observed a black pickup truck driving erratically on local roads and then swerving off the road and striking an object violently enough to cause sparks and send debris flying towards her car. Little more than one hour after the accident, Sergeant Gillingham visited Eichler's house and observed a black pickup truck in the driveway with heavy damage to its right

front passenger side corner and passenger door. At that moment, Eichler staggered towards Sergeant Gillingham with a strong odor of alcoholic beverage about his person and breath and red blood shot eyes. Eichler was slurring his speech and appeared highly intoxicated. Sergeant Gillingham asked Eichler why he left the scene of the accident, and Eichler responded: "Because I've been drinking." Sergeant Gillingham took Eichler into custody. En route to the hospital, Eichler told another officer, Officer Sholtis, that he had been involved in an accident on his way home. A blood test taken at the hospital less than 2½ hours after the accident revealed that Eichler's BAC was .30%, far above the legal limit. Officer Sholtis drove Eichler back to the police station, where Eichler told the officer that (1) he consumed three or four beers at a club in Collinsburg, (2) he was driving home from the club, alone in his Nissan truck, when he hit what he thought was a deer directly beside the Gun Rack business establishment, and (3) upon arriving home, he noticed that his truck was damaged. The Commonwealth's accident reconstruction expert, Trooper Stephenson, testified that a sober, attentive driver would have been able to slow to a reasonable speed and steer around the object, if not stop altogether.

Construed in the light most favorable to the Commonwealth, this evidence was sufficient for the jury to find Eichler guilty under section 3802(a)(1). *See Segida*, 985 A.2d at 880 (circumstantial evidence sufficient to establish guilt under section 3802(a)(1), where defendant

admitted to police officer at scene of one-vehicle accident that he had been drinking at local club and was driving himself and his brother home when he lost control of his vehicle, officer smelled strong odor of alcohol coming from defendant's person and his breath, defendant performed very badly on field sobriety tests, blood alcohol test at hospital revealed very high blood alcohol content of 0.326 percent, and officer opined that "due to traffic on the road" it was "doubtful" that accident had occurred two or three hours or even ten minutes prior to his arrival on the scene); *Commonwealth v. Teems*, 74 A.3d 142, 146 (Pa.Super.2013) (evidence of guilt sufficient under section 3802(a)(1) where officer responding to call reporting disabled vehicle observed defendant sitting in driver's seat of vehicle, in lane of traffic, depressing the brakes, car had lost its tires, defendant could not recall if he struck anything or when or where accident might have occurred, officer noticed strong odor of alcohol from defendant, defendant had red, glassy eyes and slurred speech, defendant failed to blow properly into portable alcohol breath test machine, and blood test at hospital revealed that he had BAC of .143); *Cruz*, 71 A.3d at 1008-09 (evidence was sufficient to show that defendant was under the influence of alcohol while driving at the time of the accident, as required to support convictions for DUI, homicide by vehicle while DUI, and aggravated assault by vehicle while DUI; defendant admitted that he had an accident while drunk, police officers found open bottle of beer in his car, witness testified that defendant appeared intoxicated a few hours

prior to accident, and expert in forensic toxicology testified that defendant's BAC was at least 0.08% at the time of driving, based in part on test showing defendant's BAC to be 0.232% eleven hours after accident).

The evidence also demonstrates that Eichler violated section 3802(c). His blood alcohol content was .30%, far above the minimum requirement of .16%. To be sure, his blood draw was more than two hours after he was driving, operating or in actual physical control of his pickup truck. Even so, the evidence satisfies the good cause exception under section 3802(g), because his flight from the accident scene, and the consequential delay in finding him, constituted good cause for the failure to obtain his blood test, and the Commonwealth demonstrated at trial that he did not imbibe alcohol between the time of his arrest and the time of his blood draw.

*Criminal negligence.* A person acts "negligently" with respect to a material element of a criminal offense

> when he should be aware of a substantial and unjustifiable risk
> that the material element exists or will result from his conduct.
> The risk must be of such a nature and degree that the actor's
> failure to perceive it, considering the nature and intent of his
> conduct and the circumstances known to him, involves a gross
> deviation from the standard of care that a reasonable person
> would observe in the actor's situation.

18 Pa.C.S. § 302(b)(4).

While heavily intoxicated, Eichler drove erratically down Collinsburg Road and Route 136 and then swerved off Route 136 and struck the victim, White, in his wheelchair. The Commonwealth's accident reconstruction

expert testified that a sober, attentive driver would have been able to, at least, slow to a reasonable speed and be able to steer out around the wheelchair, if not stop altogether. This evidence was sufficient for the jury to find criminal negligence. ***See Commonwealth v. Best***, 120 A.3d 329, 342 (Pa.Super.2015) (in section 3735.1 prosecution, where passenger testified that victim driver was driving normally, victim testified that he had to swerve to try to avoid colliding with defendant's vehicle, and trooper testified that defendant admitted entering opposite lane of travel, evidence was sufficient for jury to conclude that victim was driving in proper lane and defendant negligently entered victim's lane).

*Serious bodily injury to another person.* The Vehicle Code defines "serious bodily injury" as "any bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 75 Pa.C.S. § 102. Eichler stipulated that White's treating physician diagnosed White as suffering rib fractures with a small hemopneumothorax, pelvic fractures with extravasation, and L1 transverse process fractures of the lumbar spine, all Level 1 trauma injuries, as the result of being struck by a motor vehicle. These injuries created a substantial risk of death and resulted in the permanent impairment of bodily functions, thus constituting serious bodily injury.

Because the evidence satisfies every element of section 3735.1, Eichler's challenge to the sufficiency of the evidence under section 3735.1 is devoid of merit. Equally meritless is Eichler's challenge to the sufficiency of the evidence under section 3802(a)(1), which we have addressed in our discussion of section 3735.1.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/2/2016