J-A29044-24          2025 PA Super 67

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                     :         PENNSYLVANIA
                                     :
             v.                    :
                                     :
                                   :
STEVEN MOHAMED EWIDA        :
                                     :
           Appellant        :     No. 55 WDA 2024

Appeal from the Judgment of Sentence Entered December 12, 2023
In the Court of Common Pleas of Butler County Criminal Division at
No(s): CP-10-CR-0000831-2020

BEFORE: OLSON, J., LANE, J., and BENDER, P.J.E.

OPINION BY BENDER, P.J.E.:                 **FILED: MARCH 20, 2025**

Steven Mohamed Ewida (Appellant) appeals from the judgment of sentence imposed following his convictions for various offenses related to operating a "chop shop." On appeal, he challenges the denial of his motion to suppress, the sufficiency of the evidence, and his sentence. After careful review, we affirm Appellant's judgment of sentence, but remand for a new sentencing hearing due to errors in calculating the grading of two of his convictions.

We take this recitation of facts from the opinion authored by the suppression court:

> The investigation into this crime occurred because the vehicle rented to [Appellant] by Enterprise Rental was returned via a tow truck on May 7, 2020, and it was determined to need repairs. The vehicle was taken by Enterprise to the Monroeville Chrysler Jeep Dodge dealership for repairs on or about May 12, 2020. The dealership apparently contacted Enterprise because the engine in the vehicle was not the correct engine. Enterprise contacted the

Monroeville police, who then contacted the Western Pennsylvania Auto Theft Task Force. Officer [Scott] Monroe and Trooper [Jason] Morgan are assigned to the Auto Task Force.

On May 18, 2020, Trooper Morgan went to the Monroeville Chrysler Jeep Dodge dealership and was informed that the engine in the van was not from a 2019 Dodge Grand Caravan, but that it was much older and had mismatched parts and the engine number had been ground off. The [t]rooper was informed that there was a mismatch of component part stickers, such as the wiring harness or hoses[,] and that[] the component stickers marked a manufacturing date of November 2016. The engine also had Chrysler stampings on several metal pieces that led him to the conclusion that the engine likely belonged at some point to a 2016 Chrysler product. Trooper Morgan received information from the National Insurance Crime Bureau that the vehicle should have had vehicle identification number E1237910012. Based on the evidence from the engine, [Trooper] Morgan concluded that the engine in the vehicle was not that engine and[,] in fact[, it] probably came from a 2016 Chrysler product.

Trooper Morgan received information from Enterprise that the van had last been rented by [Appellant] on April 29, 2020, and had been returned via tow truck on May 7, 2020.

Suppression Court Opinion (SCO), 11/15/21, at 3-4. Officer Monroe then went to Appellant's residence to perform surveillance, and, as he drove by the home, he observed a disabled cargo van partially covered by a tarp and a tent in the driveway next to Appellant's residence. The next day, multiple officers arrived at Appellant's home, ultimately focusing their attention on the disabled van which appeared to hold an engine that had a ground-off identification number. Police subsequently arrested Appellant and charged him with owning, operating, or conducting a chop shop; alteration or destruction of vehicle information number; disposition of a vehicle or vehicle part with an

altered vehicle identification number; theft by unlawful taking; and receiving stolen property.[1]

Appellant filed an omnibus pre-trial motion, including a motion to suppress, on February 1, 2021. In that motion, Appellant argued that the warrantless search of his property was illegal. After a hearing, the suppression court granted the motion in part and denied it in part, finding that only certain evidentiary items which had been in plain view of the officers on Appellant's property were admissible at Appellant's trial. The court also found that Appellant did not consent to the search. Order, 11/15/21. The Commonwealth subsequently asked for clarification of the suppression order, and, after another hearing, the court revised its suppression order, specifying which evidentiary items were in the officers' plain view and therefore were admissible. Order, 12/30/21.

Appellant's jury trial occurred on October 10-12, 2023, resulting in convictions on all charges. The court then sentenced Appellant to an aggregate term of 6 to 23 months of incarceration followed by 84 months of probation. Sentencing Order, 12/12/23. After sentencing, trial counsel sought permission to withdraw, which the trial court granted on December 14, 2023. Appellant did not file post-sentence motions, but, through newly obtained private appellate counsel, filed a timely notice of appeal on January 5, 2024. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

---

[1] 18 Pa.C.S. §§ 7702(1), 7703, 7704, 3921(a), and 3925(a), respectively.

Appellant raises the following issues on appeal:

I.   Did the suppression court err by denying [Appellant's] Motion to Suppress Evidence where the officers' initial entry onto [Appellant's] private residential property, and only the curtilage thereof, along with the subsequent searches of that property, and the seizure of items found therein including the vehicle engine at issue, were conducted in violation of the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution?

II.  Was the evidence insufficient as a matter of law to support the verdict at

A. Count 2 – Alteration or Destruction of Vehicle Identification Number[,] where the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] altered, counterfeited, defaced, destroyed, disguised, falsified, forged, obliterated or removed a *vehicle identification number*; and/or

B. Count 3 – Disposition of Vehicle or Vehicle Part with Altered Vehicle Identification Number[,] where the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] purchased, received, disposed, sold, transferred or possessed a vehicle or vehicle part with knowledge that the *vehicle identification number* of the vehicle or vehicle part had been altered, counterfeited, defaced, destroyed, disguised, falsified, forged, obliterated or removed.

III. Did the trial court impose illegal sentences at Count 4 – Theft by Unlawful Taking or Disposition and Count 5 – Receiving Stolen Property[,] by grading each offense as a felony of the third degree where the value of the at-issue property, a fact which elevates the grading of these offenses to a felony of the third degree, was neither submitted to the jury nor found by the jury beyond a reasonable doubt?

Brief for Appellant at 3-4 (emphasis in original).

*Suppression Issue*

As Appellant's first issue alleges error in the court's failure to grant his motion to suppress, we adhere to the following standard of review:

We review trial court suppression orders to determine whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record. … Our scope of review of suppression court factual findings is limited to the suppression hearing record. We, however, are not bound by a suppression court's conclusions of law; rather, when reviewing questions of law, our standard of review is *de novo* and our scope of review is plenary.

***Commonwealth v. Barr***, 266 A.3d 25, 39 (Pa. 2021) (internal citations and quotation marks omitted).

"The Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures." ***Commonwealth v. Saunders***, 326 A.3d 888, 896 (Pa. 2024) (internal citation and alteration omitted). Further, a warrantless search or seizure has been deemed "presumptively unreasonable, subject to a few specifically established, well-delineated exceptions. These exceptions include, *inter alia*, exigent circumstances, the plain view exception, searches incident to arrest, consent searches, and automobile searches." ***Id.*** at 896-97 (cleaned up). Nonetheless, the focus of search and seizure law is on "the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime." ***Commonwealth v. Eichler***, 133 A.3d 775, 783 (Pa. Super. 2016) (citation omitted).

In this appeal, Appellant does not challenge the denial of his motion to suppress based upon a violation of his reasonable expectation of privacy; rather, his argument centers upon "property-based" standards as applied by the U.S. Supreme Court in *Florida v. Jardines*, 569 U.S. 1 (2013), and *United States v. Jones*, 565 U.S. 400 (2012). Appellant maintains that the officer's entry onto his driveway to inspect the cargo van was an unauthorized entry into the curtilage of his home. This "property-based" analysis stems from common-law trespass principles, and provides for protection of the curtilage, or the area immediately surrounding the home, as if it were part of the home itself. *Jardines*, 569 U.S. at 5-6. When an officer enters the curtilage of a residence, "the key inquiry under the property-based test becomes whether an 'implied license' exists for the officer's conduct within the curtilage." *Id.* at 8. This implied license permits a visitor to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Id.* (citing *Kentucky v. King*, 563 U.S. 452, 469 (2011)).

All parties argue herein, and we agree, that the search in this case involved police viewing material in the curtilage of Appellant's home. *See Eichler*, 133 A.3d at 784 n.6 (noting that this Court had previously held that

- 6 -

a driveway to a private residence is not curtilage,[2] but advising that, under

***Jardines***, a truck could be considered to be within the curtilage as long as it

was in an area immediately surrounding a home, even if that area was a

driveway).  The suppression court explored the details of the investigation into

the rental van and, after review, we adopt the factual findings of that court

which we conclude are supported by the record, as follows:

> [O]n May 18, 2020, Trooper Morgan tasked Officer Monroe to travel to [Appellant's] residence to conduct surveillance.  On that date, Officer Monroe took photos of the vehicle at issue, which were admitted to the [c]ourt as Commonwealth['s] Exhibits "1" and "2[,]" and a blow up of the photo at [Appellant's] Exhibit "A[."]  These photos show a white van with what appears to be a green tarp covering the front of the vehicle and a red, white and blue tent in front of the vehicle.
>
> On May 19, 2020, Trooper Morgan viewed video at the Enterprise location in Monroeville depicting the transaction of April 29, 2020[,] when [Appellant] rented the vehicle[,] and [the trooper] viewed [Appellant] at the location on May 7, 2020[,] when the vehicle was returned on the tow truck.  On May 19, 2020, Trooper Morgan tasked Officer Monroe to go to [Appellant's] residence to do a "knock and talk[,"] which is a police technique to go to a target's property and conduct a conversation.  On that date, Officer Monroe arrived at [Appellant's] residence prior to the arrival of Trooper Morgan and the other task force officers.
>
> *       *       *
>
> Officer Monroe's testimony and Trooper Morgan's testimony as to what happened at this point differs dramatically from what [Appellant] and his fiancé say happened.
>
> Officer Monroe testified that when he entered the property on May 19, 2020, [Appellant] was around the Ram ProMaster cargo van and appeared to be working on it.  The officer testified that the tent was in the area[,] but that it was a windy day and he thought

---

[2] ***See, e.g.***, ***Commonwealth v. Simmen***, 58 A.3d 811 (Pa. Super. 2012).

it blew to the side and perhaps blew over. He indicated that he could clearly see the van and [Appellant]. During his testimony, the officer was shown Commonwealth's Exhibit "3[,"] which is a front view of the van showing the tent on the right[-]hand side of the van and the tarp on the left[-]hand side of the van on the ground. He indicated that the photograph shows what it looked like on the day when he arrived at [Appellant's] residence for the "knock and talk[."]

Upon cross-examination, Officer Monroe clarified his statement[,] stating that it was a windy day and that when he arrived, the van was not covered and … the wind was blowing [the tent] further[,] and … he and [Appellant] got ahold of the tent and pulled it back so that it would not blow over the hillside. Trooper Morgan later testified that when he arrived at the property, the tent was still up so to speak[,] but the front was open which clearly showed the entire front-end of the Ram ProMaster that [Appellant] had been working on. He indicated that the tarp in question was already on the ground because nothing was covering the front of the van. He indicated that [Appellant] even discussed that it was being used as a shade and that everything was in plain view. He indicated that[,] shortly after their arrival[,] the tent did in fact blow over and blow off to the side and they actually helped put it back up, at least in some fashion, off to the side.

Trooper Morgan's version of the events seem[s] to be confirmed by [Appellant's] Exhibit "C[,"] a photo which shows a view of the ProMaster van with the tent in place, however, the sides of the tent are obviously located in such a fashion that the front of the engine was clearly in view. Officer Monroe also testified that he could see the ground-off engine number immediately when he walked up and later paced it off and indicated that he in fact could see the ground-off number from approximately 30 feet away. Commonwealth's Exhibit "4" is a close-up of the ground-off area, which can also be seen in [Appellant's] Exhibit "B" as a shiny area. Trooper Morgan later testified that he was able to view the ground-off area which he defined as "glistening in the light" and that the engine number on Chrysler products is in a similar location. He also testified that the location of the engine number in the Grand Caravan and ProMaster would be in the same place. He looked and could see the glistening of the grind mark from a distance.

[Appellant] and his fiancé's testimony regarding the placement of the tarp and tent differs greatly from the testimony of the officers.

[Appellant's] fiancé testified that she was working in the home and that she thought [Appellant] was working on a plumbing project in the bathroom in the home when she received the text message from [Appellant] that the police were there. She indicated that she went outside and saw [Appellant] and who she now knows was Officer Monroe engaged in a heated discussion. She indicated that when she went outside, the tent and tarp were in the condition they had been in the day before. Later, several police officers, she thinks six, seven or eight appeared and started destroying the tent, taking the poles down, ripping them, and throwing things around like the cinder blocks that were holding the tent. After destroying the tent, she indicated that three officers started dismantling the front end of the ProMaster. She indicated that one of the officers was actually drilling something in front of the ProMaster.

[Appellant] testified that he was working on a plumbing project in the bathroom and went outside to get tools. Officer Monroe was in his driveway and he had a heated conversation with [the officer], which led to [Officer] Monroe getting shackles, foot restraints and handcuffs, which the officer put on him. After that, [Appellant] indicated that two officers started ripping and trashing the tent, breaking it, [and] throwing stuff that was holding the tent down all over the driveway causing damage to it. He indicated that at that time[,] Officer Monroe was causing damage to the van.

SCO at 4-8.

Appellant argues that the officers' actions upon arriving at his home "objectively revealed a purpose to physically intrude on [Appellant's] property to gather information, and their own testimony at the suppression hearing proves as much." Brief for Appellant at 32. Appellant maintains that, although the officers asserted that they were merely there for a "knock and talk," their behavior on Appellant's property exceeded the limited nature of what was permitted, as the officers "trawled" for evidence. *Id.* at 32-33.

Appellant correctly states that the framework of a suppression claim grounded in the *Jardines* and *Jones* line of cases rests on the law of trespass, and the core policy contained in these opinions surrounds "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Jardines*, 569 U.S. at 6. The curtilage of a home, *i.e.*, the area immediately surrounding and associated with the home, is intimately linked to the home itself, the area where privacy expectations are most heightened. *Id.* at 7. In these cases, courts are not concerned with a defendant's reasonable expectation of privacy in an item that is seized, but the focus is upon the right of the homeowner to be free from unreasonable police intrusion into protected areas where such items may be found.

It is clear that the officers physically entered and occupied the curtilage of Appellant's property when they walked up his driveway and engaged with him. Appellant argues that the police officers exceeded any implied license that they may have had in this case because they did not walk up to the home by the front path, approach the front door, knock, wait briefly to be received, and then leave. Officer Monroe testified that when he arrived at the property, he saw Appellant in the driveway appearing to be working on the Ram ProMaster cargo van. N.T. Suppression Hearing, 9/2/21, at 12. Because it was a windy day, a tarp covering the van had blown to the side and Officer Monroe clearly saw the van. *Id.* The officer also identified the van sitting in Appellant's driveway via a photograph taken on that date. *Id.* at 13.

Appellant maintains that when the officers proceeded past the path connecting Appellant's driveway to his front door, and instead walked directly toward a vehicle of interest, they exceeded their implied license to be on the property. In other words, Appellant claims that the officers improperly entered the curtilage past the area where members of the public, like salesmen, delivery persons, and the like, were permitted to be. Appellant insists that the officer was "far from subtle" in gathering information and evidence at the home and that he merely wanted to "see what he could see" at that location. Brief for Appellant at 33.

Appellant's focus on the officer's alleged, subjective intent to gather information is irrelevant here. *See generally Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (stating that whether the actions taken by police are reasonable is "predominantly an objective inquiry" and an action may be deemed reasonable "*whatever* the subjective intent" motivating the officers, as the Fourth Amendment regulates police conduct, not thoughts) (emphasis in original). A stop or search that is objectively reasonable is not vitiated by the fact that the officer may have had another, hidden reason for his acts. *Jardines*, 569 U.S. at 10. In other words, Officer Monroe's subjective rationale for his acts does not determine whether he conducted an illegal search.

Rather, we agree with the suppression court that Officer Monroe and the other officers were permitted to enter the property and curtilage in order to further their investigation. A residential driveway is an area where visitors or

members of the public could be expected to go, whether the driveway is considered to be curtilage of the property or not. Moreover, it could be reasonably anticipated that someone approaching the home, whether an officer, salesman, or random member of the public, who saw the resident they wished to talk to standing in the driveway, would not turn away from that resident to walk to the front door and knock. Instead, the one entering the property would approach the resident to speak with him directly. This is what the officers did in this case. The officers did not commit a constitutional violation by approaching Appellant in the driveway. *See Eichler*, 133 A.3d at 784 ("First, police officers have the authority to enter the curtilage for the purpose of conducting an investigation. Second, entry onto the curtilage generally is not a Fourth Amendment violation when the curtilage is used by the public.") (internal citation omitted).[3]

After review, we conclude that Officer Monroe's conduct here did not violate Appellant's constitutional rights. The officer was investigating a serious crime and had reason to believe that Appellant was operating a type of chop shop at that location. At the time of the officer's arrival, Appellant was

---

[3] We recognize that Appellant criticizes the suppression court for relying upon *Eichler*, as that case ultimately was determined by the "reasonable expectation of privacy" test rather than property-based concerns. However, as *Eichler* points out, both the property-based test from *Jardines* and the reasonable expectation of privacy test were intended to be compatible avenues to argue for the suppression of evidence. *Eichler*, 133 A.3d at 782 n.5.

engaged in dissecting a motor vehicle in his driveway. Officer Monroe saw Appellant and approached him to ask questions, as he was permitted to do.

Moreover, as Officer Monroe's entry onto the driveway was proper, any evidence or contraband observed within plain view was properly within the officer's purview. **Saunders**, **supra** (reiterating that plain view is an exception to the warrant requirement). Under the plain view doctrine, the police may effectuate a warrantless seizure of an item if it is viewed from a lawful vantage point, the incriminating nature of the item is immediately apparent, and the police have a lawful right of access to the item. **Id.** at 897. Here, Officer Monroe was permitted to be on Appellant's driveway, and he testified that he "viewed [the ground-off spot] immediately when [he] walked up. You could see it." N.T. Suppression Hearing at 14. Officer Monroe stated that he saw the engine from about 30 paces away. **Id.** Further, Trooper Morgan also noticed the ground off number on the engine in the ProMaster right away; the trooper stated that he "could look and see the glistening of the grind mark, you know, from a distance." **Id.** at 42.

The suppression court found credible the officers' testimony that the ground-down area on the engine was visible from a distance, and that the incriminating nature of what they saw was immediately apparent. SCO at 8. As this credibility determination is supported by the record, we are bound by it. **Barr**, **supra**. Since the officers viewed the scratched-off engine number from a lawful vantage point, the incriminating nature of the item was immediately apparent, and the officers could access the item in the driveway,

the evidence was in plain view and could be seized without a warrant. **Saunders**, **supra**. Accordingly, we conclude that the suppression court did not err in denying Appellant's motion to suppress.

*Sufficiency of the Evidence*

In his second and third issues on appeal, Appellant challenges the sufficiency of the evidence to support his convictions under sections 7703 and 7704 of the Motor Vehicle Chop Shop and Illegally Obtained and Altered Property Act, 18 Pa.C.S. §§ 7701-7707. Because a determination of the sufficiency of the evidence presents a question of law, "our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Williams**, 176 A.3d 298, 305 (Pa. Super. 2017). Further, we analyze this issue under the following guidelines:

> When reviewing challenges to the sufficiency of the evidence, we evaluate the record in the light most favorable to the Commonwealth as the verdict winner, giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. However, the Commonwealth need not establish guilt to a mathematical certainty, and it may sustain its burden by means of wholly circumstantial evidence. Moreover, this Court may not substitute its judgment for that of the factfinder, and where the record contains support for the convictions, they may not be disturbed. Lastly, we note that the finder of fact is free to believe some, all, or none of the evidence presented.

**Commonwealth v. Toomer**, 159 A.3d 956, 960–61 (Pa. Super. 2017) (internal citations and quotation marks omitted).

- 14 -

Appellant challenges two of his convictions, although each challenge raises an identical claim — that the evidence was insufficient because the Commonwealth failed to prove, beyond a reasonable doubt, that Appellant altered a vehicle identification number (VIN). As the issue is the same for both convictions, we address the two sections together. The text of these sections provides:

> **§ 7703. Alteration or destruction of vehicle identification number**
>
> Any person who alters, counterfeits, defaces, destroys, disguises, falsifies, forges, obliterates or removes a vehicle identification number with the intent to conceal or misrepresent the identity or prevent the identification of a vehicle or vehicle part commits a felony of the third degree and, upon conviction, shall be sentenced to imprisonment for not more than seven years or a fine of not more than $50,000, or both.

18 Pa.C.S. § 7703.

> **§ 7704. Disposition of vehicle or vehicle part with altered vehicle identification number**
>
> Any person who purchases, receives, disposes, sells, transfers or possesses a vehicle or vehicle part with knowledge that the vehicle identification number of the vehicle or vehicle part has been altered, counterfeited, defaced, destroyed, disguised, falsified, forged, obliterated or removed and with the intent to conceal or misrepresent the identity or prevent the identification of a vehicle or vehicle part commits a felony of the third degree and, upon conviction, shall be sentenced to imprisonment for not more than seven years or a fine of not more than $50,000, or both.

18 Pa.C.S. § 7704.

Appellant's claims center upon the definition of VIN. Briefly, Appellant

- 15 -

maintains that no reasonable fact-finder could have arrived at the conclusion that he altered a VIN, or transferred a vehicle or vehicle part with an altered VIN, because the witnesses used various terms to describe what Appellant altered and they were likely discussing something other than a VIN. Brief for Appellant at 46. Rather, Appellant maintains that the only thing proven by the officers' testimony was that the vehicle had a ground-down engine number which was linked to a VIN, but not that the ground-down number on the engine was an actual VIN. *Id.* Thus, Appellant continues, the Commonwealth did not prove that he violated section 7703 because it did not establish that he "alter[ed], counterfeit[ed], deface[d], destroy[ed], disguise[d], falisifie[d], forge[d], obliterate[d], or remove[d] a vehicle identification number…." 18 Pa.C.S. § 7703. Moreover, under section 7704, Appellant argues that the Commonwealth did not prove that he possessed a vehicle or vehicle part with knowledge that the VIN of the vehicle or a vehicle part had been altered.

Our Vehicle Code provides a definition for VIN as follows: "A combination of numerals or letters, or both, which a manufacturer of a vehicle assigns to a vehicle for identification purposes or, in the absence of a manufacturer assigned number, which the Department of Transportation assigns to a vehicle for identification purposes." 18 Pa.C.S. § 7701. *See also* 75 Pa.C.S. § 102 (same).

Appellant notes that the witnesses at trial used various terms other than "VIN numbers" to describe the markings on the altered vehicles. For example, Trooper Matthew Gavrish testified that when he went to the dealership to

check on the van that had been returned to Enterprise via a tow truck, he saw that the engine in the rental van was not fully connected to the interior workings of the car; moreover, he saw grind marks in the front at the head of the engine. N.T. Trial, 10/10/23, at 136. When asked what would have been visible under those grind marks, Trooper Gavrish answered, "A pin stamp, an identifying number for that engine and a pin stamp." *Id.* Then, discussing the interaction on the next day at Appellant's residence, the trooper stated that when he looked at the Ram ProMaster at Appellant's residence, he "could clearly see … the head of the engine ground." *Id.* at 138. Again, Trooper Gavrish stated that underneath the ground-down area, he would expect to see "the pin stamp, [or an] identifying mark for the engine." *Id.* at 138-39.

Trooper Morgan explained at trial that the unique series of letters and numbers which constitute an engine number are physically put on the engine (here, it was stamped on the engine via a pin stamp), and can be cross-referenced with the VIN of the car as produced by the manufacturer. *Id.* at 163. In other words, "a VIN … is an identifier to a vehicle. That's how everyone knows its identity, so to speak." *Id.* at 164. Further, "every manufacturer produces VINs or derivatives and puts them on other places within the vehicle[.]" *Id.* When asked what numbers or labels are unique to a vehicle, Trooper Morgan testified: "[T]he primary ones that are unique outside of the VIN … would be your engine number and engine label and your transmission number and transmission label." *Id.* at 166.

Appellant suggests that, at best, the Commonwealth's evidence proved that a pin number on an engine was altered, but not that the van's VIN had been defaced. Therefore, according to Appellant, the evidence was insufficient to support his convictions. However, Appellant points us to no precedent, nor has our research disclosed any, to support the claim that there can only be one identifying number, the VIN, which these statutes address. After review, we conclude that Appellant's interpretation seems to run counter to the language of the statutes and unduly limits their application.

Section 7703 criminalizes the actions of those who alter, deface, etc., "a vehicle identification number" with the necessary intent. 18 Pa.C.S. § 7703. Notably, section 7703 references "a" vehicle identification number, not *the* VIN as Appellant wishes us to interpret the section. **See** 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). This suggests that multiple vehicle numbers could relate to a vehicle and trigger a violation of the statute.[4] This makes sense, as it was explained that various numbers on component parts of the vehicle would have their own numbers that are *cross-referenced* with a VIN to ultimately identify a vehicle. Each individual number, whether the VIN stamped on the dashboard of the car or a pin stamp on a component part, can be called a derivative VIN and is

_____

[4] This interpretation is bolstered by **Commonwealth v. Worrell**, 419 A.2d 1199, 1201 (Pa. Super. 1980) (explaining that no two vehicles have the same VIN, and that a full VIN is located on the door and frame and a shortened, derivative VIN is placed on the engine and transmission).

used to identify only one vehicle. Thus, defacing any of the vehicle identification numbers associated with a vehicle could constitute a violation of the statute.

Further, section 7704 provides that those who transfer or possess a vehicle with knowledge that "the vehicle identification number of the vehicle or vehicle part" has been altered, defaced, etc., have committed a felony. 18 Pa.C.S. § 7704. While this section does reference "the" vehicle identification number, it also refers to an identification number of a vehicle *part*, which we were informed by Trooper Morgan could potentially be an engine number/label, or a transmission number/label. N.T. Trial at 166. The trooper even called these engine and transmission numbers a "secondary" VIN stamp. *Id.* Thus, this section likewise is not limited to *the* VIN number, as Appellant contends. It applies to any identifying number on the vehicle that corresponds to only one vehicle, whether it is a pin stamp on the engine or the VIN on the dashboard.

Accordingly, we conclude that the Commonwealth's evidence supports a finding of guilt beyond a reasonable doubt in that vehicle identification numbers, specifically the 'derivative VIN numbers' that were affixed to the engines and component parts of the two vehicles in this case, were altered or defaced by Appellant. The evidence presented supports Appellant's convictions under sections 7703 and 7704 of the Motor Vehicle Chop Shop and Illegally Obtained and Altered Property Act. Appellant is entitled to no relief on his second and third issues on appeal.

*Illegal Sentence*

Finally, Appellant asserts that his sentences for theft and receiving stolen property are illegal because they were improperly graded as felonies of the third degree and the fact-finder did not find a dollar value for the engine. We are constrained to agree with Appellant on this claim.

Initially, we note that a "claim that the court improperly graded an offense for sentencing purposes implicates the legality of a sentence." ***Commonwealth v. Seladones***, 305 A.3d 83, 85 (Pa. Super. 2023). In reviewing this issue, our standard of review is *de novo* and our scope of review is plenary. ***Id.*** Because this claim implicates the legality of Appellant's sentence, it is non-waivable on appeal. ***Commonwealth v. Wolfe***, 140 A.3d 651, 660 (Pa. 2016). Thus, we may review this matter despite Appellant's not having filed a post-sentence motion in this case. ***Commonwealth v. Zampier***, 952 A.2d 1179, 1181 (Pa. Super. 2008) (stating that the failure to file post-sentence motions does not result in a waiver of an illegal sentencing claim on appeal).

Appellant's argument surrounds his sentences for theft by unlawful taking and receiving stolen property. In relevant part, our Crimes Code provides the following with respect to the grading of these offenses:

### § 3903.  Grading of theft offenses

\*     \*     \*

**(a.1) Felony of the third degree.**-- Except as provided in subsection (a) or (a.2), theft constitutes a felony of the third degree if the amount involved exceeds $2,000[…].

**(b) Other grades.**--Theft not within subsection (a), (a.1) or (a.2), constitutes a misdemeanor of the first degree, except that if the property was not taken from the person or by threat, or in breach of fiduciary obligation, and:

(1) the amount involved was $50 or more but less than $200 the offense constitutes a misdemeanor of the second degree; or

(2) the amount involved was less than $50 the offense constitutes a misdemeanor of the third degree.

18 Pa.C.S. § 3903(a.1), (b).  The statute further provides that "[w]hen the value of property cannot be satisfactorily ascertained pursuant to the standards set forth in … this subsection its value shall be deemed to be an amount less than $50."  18 Pa.C.S. § 3903(c)(3).

Appellant argues that since the jury did not make a factual finding as to the value of the stolen items, the amount should be deemed to be less than $50 and the offenses should be graded as misdemeanors of the third degree. Brief for Appellant at 52.  We agree.  This result is mandated by the line of cases beginning with **Apprendi v. New Jersey**, 530 U.S. 466 (2000).  In that case, the High Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  **Id.** at 490; **see also Commonwealth v. Panko**, 975 A.2d 1189, 1191 (Pa. Super. 2009) (specifically noting that facts which "change[] the

grade of an offense must be submitted to a jury and proven beyond a reasonable doubt").[5]

Both the trial court and the Commonwealth agree that Appellant's convictions at these two counts were improperly graded during sentencing. Further, the record reflects that the Commonwealth failed to present any evidence at all to establish the value of the missing engine. Accordingly, it was error to grade these offenses as felonies; the proper grade for both counts under 18 Pa.C.S. § 3903(c)(2) is misdemeanor of the third degree. Because Appellant received a sentence on Count 4, the sentencing court's sentencing scheme has been disrupted. Therefore, we must vacate Appellant's judgment of sentence and remand for a new sentencing hearing.

Judgment of sentence affirmed in part, reversed in part. Case remanded for a new sentencing hearing. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/20/2025

---

[5] An exception to this rule has arisen to permit a court to change the grading of an offense based upon admissions made by the defendant. *Seladones*, 305 A.3d at 86. This exception does not apply to Appellant's case.