J-A02021-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RONALD EARL SCHISSLER, JR. | : | No. 616 WDA 2025 |

Appeal from the Order Entered May 9, 2025
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0002599-2024

BEFORE:  STABILE, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.:                **FILED: February 3, 2026**

The Commonwealth of Pennsylvania (the Commonwealth) appeals from the order granting the motion to suppress filed by Ronald Earl Schissler, Jr. (Schissler), in which Schissler sought to suppress evidence obtained during a search of his real property.[1]  After careful review, we affirm.

The suppression court summarized its findings of fact as follows:

Testimony offered at the hearing on [Schissler's] suppression motion showed that on July 17, 2024, at approximately 10:45 p.m., Pennsylvania State Trooper Joshua Humphrey ("Trooper Humphrey") was dispatched to investigate an incident involving [Schissler].  Because Trooper Humphrey had investigated another

---

[1] The Commonwealth has properly certified that the order "will terminate or substantially handicap the prosecut[ion]."  Notice of Appeal, 5/19/25 (citing Pa.R.A.P. 311(d) ("In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.")).

incident involving [Schissler] earlier that day, he was familiar with [Schissler's] vehicle and where he resided. Trooper Humphrey testified that when he approached [Schissler's] residence at 231 Main Street in Youngstown, [Pennsylvania,] he observed [Schissler's] vehicle entering into his backyard with the lights on. He stated that he was able to see [Schissler's] vehicle from Main Street.

Trooper Humphrey testified that the area where he observed [Schissler] entering the backyard is a grassy area immediately beside his house, which is portrayed in Commonwealth Exhibit 3.[FN] [Trooper Humphrey] described [Schissler's] backyard as an open, grassy area that borders an automobile repair shop on Main Street and a fire department behind his property. He testified that he did not see fences or signs warning against trespassing on [Schissler's] property.

---

[FN] Commonwealth Exhibits 1-4, entered into evidence at the suppression motion hearing, are photographs of the outside of [Schissler's] house and the area surrounding it. The exhibits show there are no driveways or sidewalks on [Schissler's] property leading to the back of the house.

---

Trooper Humphrey parked his police car on Main Street, then walked into [Schissler's] backyard to continue his investigation. [Trooper Humphrey did not have a warrant to search Appellant's property.] He testified that [Schissler's] vehicle was parked approximately five to ten feet behind [Schissler's] house and that the distance between the vehicle and Main Street was approximately thirty feet.

Trooper Humphrey testified that when he approached [Schissler's] vehicle, he saw two feet and the bottom portion of legs hanging out of the passenger side of the front of [Schissler's] truck. [Schissler] exited the vehicle after Trooper Humphrey announced himself. Trooper Humphrey stated that he saw two cans of compressed air laying on the ground, and that [Schissler] was disheveled and disoriented and had glassy, bloodshot eyes. [Trooper Humphrey] identified the vehicle as [Schissler's] and testified that he knew[,] from prior events that day[,] that the vehicle did not have an ignition interlock system[,] which [Schissler] was required to have. Trooper Humphrey then took

[Schissler] into custody for [driving under the influence (DUI),] and [Schissler] consented to a blood test.

Suppression Court Opinion and Order, 5/9/25, at 2-3 (some capitalization modified).

Trooper Humphrey filed a criminal complaint, charging Schissler with DUI and related offenses. The Commonwealth subsequently charged Schissler, via criminal information, with one count each of DUI – alcohol or controlled substance and illegally operating a vehicle not equipped with ignition interlock, and the summary offenses of driving under suspension – DUI related and reckless driving.[2]

On November 5, 2024, Schissler filed a motion to suppress evidence any "observations drawn from" Trooper Humphrey's encounter with Schissler, which Trooper Humphrey used to support the affidavit of probable cause. Schissler argued that Trooper Humphrey's "intrusion upon the curtilage of [Schissler's] residence was unconstitutional, in clear violation of his right against unreasonable search and seizure…" under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. Motion to Suppress, 11/5/24, ¶ 10. Additionally, Schissler claimed there was no exigency which would permit Trooper Humphrey to enter Schissler's yard immediately behind his residence. *Id.*, ¶¶ 13-15.

---

[2] 75 Pa.C.S.A. §§ 3802(d)(2), 3808(a)(1), 1543(b)(1)(i), 3736.

The suppression court conducted a hearing on Schissler's motion to suppress on April 25, 2025. The Commonwealth introduced as exhibits photographs of Schissler's residence, including the yard and open area around the residence, and an aerial photograph depicting Schissler's entire property and surrounding buildings.

During the hearing, Trooper Humphrey clarified that, at the start of his shift on July 17, 2024, he received a dispatch concerning a suspicious person (the report). N.T., 4/25/25, at 6.[3] The report identified Schissler by name. *Id.* Based on the report, Trooper Humphrey changed his route and proceeded to Schissler's residence, his "last known location." *Id.* at 7. Trooper Humphrey estimated that Schissler's vehicle was positioned approximately five to ten feet away from the residence, and approximately 30 feet away from Main Street. *Id.* at 11-12; *id.* at 11 (Trooper Humphrey explaining Schissler had parked his vehicle "[d]irectly in the center of the house[,]" in the backyard).

Trooper Humphrey testified that he "approached from the opposite side of the neighboring house[.]" *Id.* at 7. When Trooper Humphrey first

---

[3] Notably, **the reason for the report was not explicitly detailed during the suppression hearing**. However, in the affidavit of probable cause supporting the criminal complaint, Trooper Humphrey explained that an unidentified Walmart employee had observed Schissler "'huffing' canned air[, *i.e.*, consuming intoxicants]." Criminal Complaint, 7/18/24 (Affidavit of Probable Cause). Trooper Humphrey also averred that earlier the same day, he had arrested Schissler following a DUI-related hit-and-run vehicle crash, after which he had instructed Schissler not to operate a vehicle. *Id.*

approached the vehicle, he was unable to ascertain whether Schissler was the individual inside or whether he was "actively huffing at that time[.]" *Id.* at 8, 14.

The Commonwealth stated its position that the interaction between Trooper Humphrey and Schissler was not an unreasonable search and seizure, emphasizing that Schissler's vehicle was in plain view from the street. *Id.* at 19. The Commonwealth also argued Schissler's residence was located on an "open field," and highlighted the lack of fences or gates around the property. *Id.* Schissler's counsel, on the other hand, argued that Schissler's vehicle was parked in Schissler's backyard, where he is entitled to a greater expectation of privacy. *Id.* at 19-20. The suppression court took the matter under advisement.

On May 9, 2025, the suppression court issued an opinion and order granting Schissler's motion to suppress. The Commonwealth filed a timely notice of appeal, containing its Rule 311(d) certification. The Commonwealth and the suppression court have complied with Pa.R.A.P. 1925.[4]

The Commonwealth raises a single issue for review: "Whether the [suppression] court erred in finding a Fourth Amendment violation based on the officer's entry onto [Schissler's] property[?]" Commonwealth Brief at 4.

---

[4] On August 12, 2025, this Court dismissed the Commonwealth's appeal based on its failure to file a docketing statement. Upon application by the Commonwealth, this Court reinstated the appeal.

The Commonwealth claims the suppression court erred by concluding Trooper Humphrey violated Schissler's Fourth Amendment rights.[5] *Id.* at 8. First, the Commonwealth argues Schissler's backyard is not considered curtilage under Fourth Amendment jurisprudence, because he possessed no subjective expectation of privacy in his backyard. *Id.* at 8-9. The Commonwealth points out that Schissler's "backyard is a piece of empty field, devoid of any fencing, gating, or "No Trespass" signs." *Id.* at 9. Additionally, the Commonwealth emphasizes that Schissler's vehicle was visible from the street. *Id.* at 10; *see also id.* ("Anybody visiting the [neighboring] garage or the fire department could easily see into Mr. Schissler's backyard and ascertain his whereabouts.").

Second, the Commonwealth argues that even if Schissler's vehicle was parked in the curtilage of his home, Trooper Humphrey lawfully entered the curtilage for an investigatory purpose. *Id.* Relying on ***Commonwealth v. Eichler***, 133 A.3d 775 (Pa. Super. 2016), which we discuss further *infra*, the Commonwealth emphasizes that Trooper Humphrey drove to Schissler's property in response to a report which specifically identified Schissler as the "suspicious person." *Id.* at 11-12. Trooper Humphrey observed Schissler's vehicle exit the road and turn into his backyard. *Id.* at 12.

_____

[5] The Commonwealth does not advance an argument under Article I, section 8 of the Pennsylvania Constitution.

We are mindful of the following standard of review:

When this Court reviews a Commonwealth appeal from an order granting suppression, as we are tasked to do here, **we may only consider the evidence produced at the suppression hearing**; we may review only the evidence which comes from the defendant's witnesses, along with the Commonwealth's evidence which remains uncontradicted. We must determine, in the first instance, whether the suppression court's factual findings are supported by the record and if they are, we are bound by those findings. We must also keep in mind that the suppression court, as fact-finder, has the exclusive ability to pass on the credibility of witnesses. Therefore, we will not disturb a suppression court's credibility determinations absent a clear and manifest error.

*Commonwealth v. Carver*, 318 A.3d 386, 389-90 (Pa. Super. 2024) (emphasis added; internal citations and quotation marks omitted).

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, papers, and effects, against unreasonable searches and seizures, shall not be violated…." U.S. CONST. amend. IV. Under the Fourth Amendment, warrantless searches and seizures are presumptively unreasonable. *Commonwealth v. McCree*, 924 A.2d 621, 627 (Pa. 2007).

The law of search and seizure remains focused on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime.

*Eichler*, 133 A.3d at 783 (citation omitted).

The Commonwealth's challenge to the grant of suppression is premised on expectation-of-privacy principles.[6] Pennsylvania courts have extended the federal constitutional protection against warrantless searches and seizures

> to the curtilage of a person's home by analyzing factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. Curtilage is entitled to constitutional protection from unreasonable searches and seizures as a place where the occupants have a reasonable expectation of privacy that society is prepared to accept.

*Id.* (internal citations and quotation marks omitted).  **Curtilage is** "**the area 'immediately surrounding and associated with the home**[.]'"  *Id.* (quoting *Jardines*, 569 U.S. at 6) (emphasis added).

Here, Trooper Humphrey's testimony established that Schissler's vehicle was parked approximately five to ten feet from his house, and was positioned "[d]irectly in the center of the house[.]"  N.T., 4/25/25, at 11.  Based on Trooper Humphrey's description of the vehicle's location, Schissler's vehicle was clearly parked within the area "immediately surrounding and associated with [his] home."  *Eichler*, 133 A.3d at 783 (quoting *Jarines*, *supra*).

_____

[6] By contrast, property-based Fourth Amendment analysis is "tied to common-law trespass." *Eichler*, 133 A.3d at 782 n.5 (citing *United States v. Jones*, 565 U.S. 400, 405 (2012)).  "*Jones* and [*Florida v.*] *Jardines*[, 569 U.S. 1 (2013),] indicate that defendants have the option to raise Fourth Amendment challenges under both expectation-of-privacy and property-based principles." *Eichler*, 133 A.3d at 782 n.5.  However, because the Commonwealth limits its challenge to expectation-of-privacy principles, we decline to conduct a property-based analysis. *Id.* (declining to consider property-based principles where the appellant challenged the police officer's actions only under expectation-of-privacy principles).

Accordingly, at the time Trooper Humphrey approached on foot, Schissler's vehicle was parked within the curtilage, in which he had a reasonable expectation of privacy. **See id.** (concluding the defendant's truck, which was parked several feet from his home, "clearly was within the curtilage."); **see also id.** n.6 (explaining, "We find it necessary to follow **Jardines**, because this Court must follow the United States Supreme Court's interpretation of the federal Constitution.").

However, our inquiry does not end here, as our courts have also clarified two exceptions to the warrant requirement as it pertains to curtilage:

> First, police officers have the authority to enter the curtilage for the purpose of conducting an investigation. **Commonwealth v. Gibson**, … 638 A.2d 203, 207 ([Pa.] 1994) ("police have the power to knock on the doors of the citizens of this Commonwealth *for investigatory purposes* without probable cause") (emphasis added). Second, entry onto the curtilage generally is not a Fourth Amendment violation when the curtilage is used by the public. **Cf.** [**Commonwealth v.**] **Gibbs**, 981 A.2d [274,] 280 [(Pa. Super. 2009)] ("courts which have found that the front porch constitutes curtilage have generally found no Fourth Amendment violation where the porch in question is used by the general public"); **see generally** LaFave, *Search and Seizure: A Treatise On The Fourth Amendment*, § 2.3(f) (5th ed.) (database updated October 2015) ("when the police come on to private property to conduct an investigation … and restrict their movements to places visitors could be expected to go (*e.g.*, walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment").

**Eichler**, 133 A.3d at 784 (footnote omitted).

Regarding the application of these exceptions, we find this Court's decision in **Eichler** instructive. In **Eichler**, a witness observed a black pickup truck driving erratically, after which it ultimately struck a pedestrian. **Id.** at

- 9 -

780-81. Police found a black vehicle fender, bearing a Nissan logo and a visible serial number, on the scene. *Id.* From the serial number, a Nissan dealership advised police that the vehicle in question was a Nissan Titan pickup truck. *Id.*

A police sergeant (the sergeant) met a local Game Commission Officer, who was aware of a black Nissan Titan pickup truck located at a particular residence; the sergeant knew the described residence as belonging to the defendant (Eichler). *Id.* The sergeant drove to Eichler's residence, which

> stands about 200 feet from Salem Church Road, on a hillside at least 40 feet above the road, at the end of a long, steep driveway which bends to the left through dense trees and shrubbery. There are no fences, gates, or "no trespassing" signs to keep visitors out.

*Id.* (citations to record omitted). The sergeant "pulled up directly behind the truck" and approached on foot with a flashlight. *Id.* at 781-82. The sergeant "observed a large amount of damage to the right front corner and passenger side of the truck." *Id.* at 782. Eichler came out of the residence, exhibiting clear signs of intoxication. *Id.* A second sergeant then reported to the residence; he observed the damage to the front of the pickup truck and noted that the truck's engine was still warm. *Id.*

Eichler filed a motion to suppress evidence obtained during the warrantless search, which the suppression court denied. *Id.* On appeal, a panel of this Court affirmed the denial of suppression. As stated above, the *Eichler* Court first concluded Eichler's truck was within the curtilage, as it was

- 10 -

parked several feet from his house. *Id.* at 784. Nevertheless, applying the above-described exceptions, we concluded the sergeant's entry into the curtilage was reasonable and "within the course of a legitimate police investigation." *Id.* at 784-85. We reasoned as follows:

> [The sergeant] was investigating a serious hit-and-run accident that had occurred just over one hour before. He obtained information at the accident scene and then from a Game Commission Officer that gave him reason to believe that a black Nissan pickup truck owned by Eichler was involved in the accident. While Eichler's house stands 200 feet from the roadway, it is still accessible to the general public, because there are no fences or gates on his driveway or signs that warn against trespassers or prohibit public entry. *Gibbs*, 981 A.2d at 280 (officers conducting surveillance of suspected drug dealer's residence did not need warrant to enter front porch, where porch was empty, unenclosed concrete slab that did not have gate blocking entry, there were no signs warning against trespass or evidence that defendant prohibited general public from accessing porch, and officers observed pizza deliveryman and suspected drug purchasers use porch shortly before officers decided to approach front door). As [the sergeant] drove up the driveway, he saw a black Nissan pickup truck next to the house, so he parked directly behind the truck, exited his patrol vehicle, walked directly behind the truck, and observed significant damage. These were all reasonable acts within the course of a legitimate police investigation. The truck was in plain view, and the front of the truck was in a location where visitors would be expected to go.

*Id.* (some citations and footnote omitted).

Instantly, regarding his purpose for approaching Schissler's vehicle, Trooper Humphrey testified that on July 17, 2024, he received a report of a suspicious person, who was specifically identified as Schissler. N.T., 4/25/25, at 6. Due to an incident that occurred earlier that day, Trooper Humphrey was familiar with Schissler, his vehicle, and his residence. *Id.* Trooper

Humphrey testified that he arrived at Schissler's residence approximately 20 minutes after he received the report. *Id.* at 7; *see also id.* at 14 (Trooper Humphrey explaining he arrived at Schissler's residence at about 10:43 p.m.). Trooper Humphrey observed Schissler's vehicle "entering into his back yard area with the lights on." *Id.* at 7.

> Trooper Humphrey explained what next transpired:
>
> [Trooper Humphrey]: … I continued forward, I turned my vehicle around, parked my vehicle. And then I approached from the opposite side of the neighboring house to continue the investigation to ensure that that's exactly who and what I saw.
>
> [The Commonwealth]: Okay. And when you approached the vehicle[,] were you able to determine who was driving that vehicle?
>
> [Trooper Humphrey]: Not initially. When I came around the corner[,] I saw feet hanging out the passenger side. I announced myself, and also the name Ronald or Ron. … [A]nd that's when [Schissler] exited the vehicle, and I confirmed that it was him at that point.

*Id.* at 7-8.

The suppression court did not specifically determine whether Trooper Humphrey had authority to enter the curtilage for an investigatory purpose. Based on the limited suppression record, *Carver*, 318 A.3d at 389 (stating that "we may only consider the evidence produced at the suppression hearing"), we cannot conclude that Trooper Humphrey entered the curtilage of Schissler's residence for a legitimate investigatory purpose. For example, Trooper Humphrey testified vaguely that he received the report about a "suspicious person" whom the caller identified as Schissler. N.T., 4/25/25, at

6; *see also id.* at 13, 16 (Trooper Humphrey acknowledging the original report was made via a 911 call by an anonymous witness, and Trooper Humphrey never spoke to the witness). **However, Trooper Humphrey provided no additional testimony concerning the content of the 911 call or what behavior the caller had identified as suspicious.** Nor did Trooper Humphrey indicate whether the anonymous caller provided any information concerning Schissler's whereabouts at the time of the incident. *Cf. Eichler*, 133 A.3d at 784-85 (concluding the sergeant's entry into the curtilage of Eichler's property was constitutional, where the sergeant was "investigating a serious hit-and-run accident that had occurred just over one hour before[,]" and he had received additional information leading him to reasonably believe Eichler's vehicle had been involved in the accident).

Next, we consider whether the area in which Schissler parked his vehicle was open to or used by the public. In addressing this issue, the suppression court distinguished the facts of *Eichler*:

> In this case, there were **no driveways or sidewalks** leading to the backyard of [Schissler's] house. [Schissler] allegedly drove from Main Street through a grassy area beside his residence into his backyard, where he parked his truck in a grassy area five to ten feet behind his house. Commonwealth's Exhibits 1-4 show that **there is no access from the front of the house to the back of the house by driveway or sidewalk**. Rather, the expected route for visitors to [Schissler's] house would be from Main Street, where the public would park, to [Schissler's] front door, which is near Main Street.
>
> The court agrees with [Schissler] that, compared to the defendant in *Eichler*, Schissler had a greater expectation of

- 13 -

privacy in his backyard, **an area that visitors would not be expected to go**. …

Suppression Court Opinion and Order, 5/9/25, at 5 (emphasis added; citations omitted). In its Rule 1925(a) opinion, the suppression court also reasoned as follows:

> [Schissler's] car was parked in a grassy location five to ten feet behind his house and centered with the house. …. Moreover, Trooper Humphrey admitted that he knew that the front door was an option for making contact with [Schissler], because he had made contact with [Schissler] at the front door earlier that day. In **Eichler**, on the other hand, police entered the property and parked on the defendant's driveway near his house, an area obviously open to the public.
>
> Trooper Humprey described [Schissler's] backyard as an open and grassy area without fences and gates, and bordered by an automobile repair shop and a fire department. While those factors are to be considered, the court must also consider additional criteria to determine [Schissler's] privacy interests. Additional factors that the court finds persuasive in assessing [Schissler's] reasonable expectation of privacy include the close proximity of [Schissler's] vehicle to his residence (just five to ten feet away) and **the absence of a driveway or sidewalk leading to that area**. …

Rule 1925(a) Opinion, 7/11/25, at 6-7 (emphasis added; citations omitted).

Upon review, we conclude the suppression court's factual findings are supported by the record, and its legal conclusions are sound. As previously stated, Trooper Humphrey described the location of Schissler's vehicle as approximately 30 feet away from Main Street, five to ten feet from the residence, and centered with the residence. *See* N.T., 4/25/25, at 11-12.

We, like the suppression court, acknowledge Trooper Humphrey's testimony that the property did not have a fence or "No Trespassing" signs.

*Id.* at 9. However, we conclude the absence of such physical barriers or signs is not dispositive. Schissler's front door faces Main Street, where Trooper Humphrey parked his police vehicle. Trooper Humphrey also "admitted that he knew that the front door was an option for making contact with [Schissler], because **he had made contact with [Schissler] at the front door earlier that day.**" Rule 1925(a) Opinion, 7/11/25/25, at 6 (emphasis added). Instead, Trooper Humphrey chose to bypass Schissler's front door and enter the backyard, to which there is **no public access** via driveway or sidewalk. The Commonwealth offered no evidence suggesting Schissler's backyard— particularly the area within only about five to ten feet of his residence—was open to the public. Thus, the record supports the suppression court's findings, and its legal conclusions are sound.

Based upon the foregoing, the suppression court properly concluded that Trooper Humphrey's entry into the curtilage of Schissler's residence was an illegal search and seizure, in violation of the Fourth Amendment. Thus, we affirm the suppression court's order granting Schissler's motion to suppress.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

2/3/2026